J-S03025-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NIRAN L. WILLIAMS | : | |
| | : | |
| Appellant | : | No. 1118 EDA 2018 |

Appeal from the Judgment of Sentence December 1, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0001887-2016,
CP-51-CR-0001889-2016, CP-51-CR-0001890-2016,
CP-51-CR-0001891-2016, CP-51-CR-0001892-2016,
CP-51-CR-0001893-2016

BEFORE:  BENDER, P.J.E., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY OLSON, J.:                          **FILED APRIL 05, 2019**

Appellant, Niran L. Williams, appeals from the judgment of sentence entered on December 1, 2017, following his jury convictions for six counts of robbery, two counts each of rape, involuntary deviate sexual intercourse (IDSI), and sexual assault, and three counts each of possessing an instrument of crime (PIC), possessing a firearm without a license, and carrying a firearm on public streets in Philadelphia.[1]  After review, we affirm.

We briefly summarize the facts and procedural history of this case as follows.  On January 15, 2016, police arrested Appellant and charged him with

_____

[1]  18 Pa.C.S.A. §§ 3701, 3121, 3123, 3124.1, 907, 6106, and 6108, respectively.  In a separate bench trial following the jury's verdict, the trial court also found Appellant guilty of three counts of persons not to possess a firearm pursuant to 18 Pa.C.S.A. § 6105.

the foregoing criminal charges for incidents occurring over the course of three separate days in January 2016. Prior to trial, the Commonwealth presented a motion to consolidate all of the charges into a single proceeding. The trial court held a hearing on the consolidation motion on December 5, 2016 and granted relief. A single jury trial commenced on June 5, 2017. At trial, the Commonwealth presented the testimony of three female victims,[2] J.B., S.G., and Y.N., who were working as prostitutes and utilizing a website called "Backpage." N.T., 6/6/2017, at 18-19.

J.B. testified that on January 4, 2016, Appellant met her at her cousin's house and they engaged in consensual sex for money in an upstairs bedroom. N.T., 6/7/2017, at 14-17. Appellant produced a firearm, asked J.B. if she had any money, and rummaged through her make-up bag looking for cash. N.T., 6/6/2017, at 30. J.B. testified that Appellant ordered her to go downstairs to the living room where J.B.'s mother (J.J.), a friend (T.S.), and her friend's three-year-old son (I.H.) were also present. *Id.* at 30-33. Although J.B. testified that Appellant did not draw a firearm at that time, she told the other three people present that Appellant had a gun and to comply with him. *Id.* at 32. Appellant demanded cellular telephones from J.J. and T.S. and they complied. *Id.* at 31-32. Appellant asked if others lived at the residence and when J.B. told Appellant that her cousin also lived there, he threatened to kill everybody if anyone entered the residence. *Id.* at 32-33. J.J.

_____

[2] We use initials to protect the victims' identities.

hyperventilated. *Id.* at 32. Appellant then forced everyone except J.B. into an upstairs bathroom and closed the door. *Id.* at 33. Appellant directed J.B. to carry three televisions and various electronics found throughout the house to Appellant's car. *Id.* at 34-35. Appellant also took J.J.'s wallet and an electronic tablet. *Id.* at 43. Thereafter, Appellant took J.B. into the kitchen at gunpoint, forced her to perform oral sex on him, and had non-consensual vaginal sex with her from behind. *Id.* at 35-37. J.B. gave police a statement three days later and identified Appellant from a photo array. *Id.* at 47. J.B. also identified Appellant at trial. N.T., 6/6/2017, at 27. An investigating officer testified that J.B. was shown a photo array and she immediately identified Appellant and said she was "one-hundred percent" certain that he was the perpetrator. N.T., 6/13/2017, at 23-24.

J.J. testified similarly. N.T., 6/7/2017, at 72-75. She also stated that Appellant led her, T.S., and I.H. into the bathroom, told them not to leave, and said that if they cooperated he would not hurt them. *Id.* at 73-77. J.J. testified that she remembered Appellant wielding a firearm and "taunting" her with it. *Id.* at 76-77. J.J. identified Appellant by photograph to police a few days after the incident and, again, at trial. *Id.* at 76; 82-83. T.S. also testified that Appellant wielded a firearm and commanded her, I.H., and J.J. into the bathroom. *Id.* at 138-142. She testified that Appellant stole televisions, cellular telephones, and her wallet from the residence. *Id.* at 142-144. T.S. identified Appellant as the perpetrator at trial. *Id.* at 143.

S.G. testified that a man named Haneef contacted her and they engaged in consensual sex for money at her home on January 5, 2016. N.T., 6/8/2017, at 6-11. While S.G. was in the bathroom, Haneef let Appellant into her home. S.G. testified that Appellant held her at gunpoint, forced her to perform oral sex on him, and had non-consensual vaginal sex with her from behind. *Id.* at 6-7, 12-14. Appellant ordered Haneef to tie up the victim and then stole a television, jewelry, and money. *Id.* at 6; 18-19. Appellant left S.G. tied up in the bathroom, turned off the lights, and told her to stay there for 45 minutes to an hour. *Id.* at 20-21. S.G. identified Appellant from a photo array a week after the incident and identified him again at trial. *Id.* at 6; 30-31. An investigating officer testified that S.G. did not hesitate in identifying Appellant from a photo array, stating, "I think that's him. His mouth is closed, but that is him." N.T., 6/12/2017, at 180. Another investigating officer testified about photographs he took the day of the incident showing S.G. with ligature marks on her wrists. N.T., 6/13/2017, at 50.

Y.N., who is hearing impaired, testified through an interpreter that Appellant arranged to have sex at her house on January 6, 2016. N.T., 6/8/2017, at 123. When Y.N. went outside to check her mail, Appellant appeared with a gun, commanded the victim back inside, forced her to perform oral sex on him, and had non-consensual vaginal sex with her from behind. *Id.* at 124-125. He took money and a cellular telephone and left. *Id.* at 124-125. Y.N. called the police by videophone through an interpreter operator. *Id.* at 136. She did not initially tell police that she was raped,

because all of the officers she dealt with were males and she was uncomfortable talking to them. *Id.* at 139-141. At first glance, Y.N. was unable to identify her assailant by photographic array. N.T., 6/12/2017, at 178. However, when shown the photographic array a second time, Y.N. identified Appellant and said, "almost." *Id.* at 179-180. Y.N. identified Appellant at trial. N.T., 6/8/2017, at 136.

Police obtained a search warrant and reviewed the records of a pre-paid cellular telephone used to contact J.B., S.G., and Y.N. N.T., 6/13/2017, at 60-61. Because the cellular telephone was on a pre-paid plan, there was no background information regarding the owner. *Id.* at 61. However, the call log on the telephone generated a most frequently called list that led police to a woman named Cassandra Torres. *Id.* at 64; 71; 74-75. Records showed that Torres drove a white Ford Fusion and lived in an apartment on Comly Street in Philadelphia. *Id.* at 74-75. Moreover, there were multiple calls to a car service called Family Cab Company. *Id.* at 63. Detectives went to Family Cab Company and obtained its travel logs. *Id.* at 71-72. The logs revealed that on January 6, 2016 the car service picked someone up at the Comly apartment building and dropped the individual off near S.G.'s residence right before the incident at issue. *Id.* at 73. As a result, police surveilled the Comly Street apartment complex. *Id.* at 74-75. They saw Torres leaving the building with an unknown man in a white Ford Fusion. *Id.* at 75. They followed her and saw an unknown woman approach the vehicle. *Id.* at 76. Police eventually stopped the unknown woman and she provided them with "a

potential contact [telephone] number the person in the car had given her." *Id.* at 76. The telephone number was the same as the one used to call J.B., S.G., and Y.N. *Id.* at 76-77. Police returned to the Comly Street apartment complex, stopped Torres' vehicle, and detained Appellant who was a passenger. *Id.* at 78-79. One of the investigating officers called the telephone number at issue and a cellular telephone in Appellant's possession rang. *Id.* at 78-79. When asked for identification, Appellant initially told police his name was Troy Brown. *Id.* at 148. When confronted about the false information, Appellant gave his real name. *Id.* at 149. Police later executed a search warrant at the Comly Street residence and recovered a "Ruger nine millimeter pistol; two-tone black and blue steel [that] was loaded with seven live rounds." N.T., 6/13/2017, at 83. They also recovered a photograph of Torres and Appellant that suggested they were romantically involved. *Id.* at 83; 135-136. Police, however, did not find any of the items stolen from J.B., J.J., T.S., S.G., or Y.N. *Id.* at 140. Appellant later told police "that he had just moved in with his girlfriend, they moved [to] the Comly Street apartment. He didn't know the address." *Id.* at 143.

The jury found Appellant guilty of the aforementioned charges on June 15, 2017.[3] On December 1, 2017, the trial court sentenced Appellant to an aggregate term of 36 to 72 years of incarceration. Appellant filed a timely

_____

[3] Although the Commonwealth charged Appellant with various sexual offenses pertaining to S.G., the jury acquitted him of those crimes.

post-sentence motion, which was denied by operation of law on April 16, 2018. This timely appeal resulted.[4]

On appeal, Appellant presents the following issues[5] for our review:

1. Did not the trial court err in granting the Commonwealth's motion to consolidate separate indictments where the facts of each case did not demonstrate sufficient similarity to establish a common plan, scheme and design, and the probative value of the evidence introduced through consolidation of the cases was outweighed by the prejudice resulting from the consolidation?

2. Was not the evidence insufficient to sustain verdicts for guilt for first-degree robbery [in all three of the criminal cases against Appellant], because the Commonwealth failed to prove beyond a reasonable doubt the elements of either theft or the intent to place one in fear of immediate serious bodily injury?

3. Were not the verdicts [] against the weight of the evidence where the testimony on each case was so inherently unreliable and incredible as to shock the conscience, and a new trial should be granted in the interests of justice?

4. Did not the trial court err as a matter of law and violate the discretionary aspects of sentencing when it imposed a manifestly excessive and unreasonable sentence of 36 to 72 years of incarceration, where the maximum term of the sentence imposed a term unlikely to end during [A]ppellant's natural life span and the sentence in its entirety was in excess of what was necessary to address the gravity of the offense,

_____

[4] Appellant filed a notice of appeal on April 16, 2018. On April 20, 2018, this Court received correspondence from the Philadelphia Clerk of Courts that forwarded the certified record to this Court without an opinion pursuant to Pa.R.A.P. 1925(a) because the Honorable Roger Gordon, who presided over Appellant's trial, was no longer sitting as a judge in Philadelphia County. Moreover, we note that the trial court did not order Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

[5] We have reordered Appellant's issues for ease of discussion.

the protection of the community and [A]ppellant's rehabilitative needs?

Appellant's Brief at 5-6.

In the first issue we address, Appellant argues that the trial court erred by granting the Commonwealth's motion to consolidate all of the charges into a single trial. *Id.* at 50-55. He claims the cases warranted separate trials, based upon the following "significant" differences:

> (1) one of the victims was alleged to have been tied up while the other two were not; (2) the three assault victims were not identical in age or race; (3) the description provided of the alleged perpetrator differed between the three assault victims (one said he had a beard, one said a goatee, and one said no facial hair at all); (4) and two males were involved in one case while only one male was involved in the other two. Thus, at most, all that the testimony established was that the commission of crimes or conduct was "of the same general class."

Appellant's Brief at 54-55 (record citation omitted).

"The determination of whether separate [bills of criminal] information should be consolidated for trial is left to the discretion of the trial court, whose decision will not be disturbed absent a manifest abuse of discretion." *Commonwealth v. Johnson*, 179 A.3d 1105, 1116 (Pa. Super. 2018).

Pennsylvania Rule of Criminal Procedure 582 provides in relevant part:

> (1) Offenses charged in separate indictments or informations may be tried together if:

>> (a)   the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or

- 8 -

> (b)  the offenses charged are based on the same act
> or transaction.

Pa.R.Crim.P. 582.  "The court may order separate trials of offenses [] if it appears that any party may be prejudiced by offenses [] being tried together." Pa.R.Crim.P. 583.

Moreover, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Pa.R.E. 404(b)(1). However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice."  Pa.R.E. 404(b)(2).

Our Supreme Court has stated:

> It is a principle of long standing in this Commonwealth that evidence of a distinct crime, except under special circumstances, is inadmissible against a defendant who is being tried for another crime because the commission of one crime is not proof of the commission of another, and the effect of such evidence is to create prejudice against the defendant in the jury's mind.  The general rule, however, allows evidence of other crimes to be introduced to prove (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the commission of the crime on trial, in other words, where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other. Thus, although the law does not allow use of evidence which tends solely to prove that the accused has a "criminal disposition," evidence of other

crimes is admissible for certain purposes if the probative worth of this evidence outweighs the tendency to prejudice the jury.

Similar safeguards are necessary where a defendant is tried for two or more offenses in one trial, for the prejudice to the defendant may be just as insidious and the temptation on the part of the prosecutors to cumulate the crimes may be just as great. The rule ... is that offenses may be joined or indictments may be consolidated where the separate offenses show the defendant's unusual or distinctive *modus operandi*.

\* \* \*

The Commonwealth must show more than the other crimes are of the same class as the one for which the defendant is being tried. Rather, there must be such a high correlation in the details of the crimes that proof that the defendant committed one makes it very unlikely that anyone else but the defendant committed the others.

**Commonwealth v. Armstrong**, 74 A.3d 228, 233–234 (Pa. Super. 2013),

*citing* **Commonwealth v. Morris**, 425 A.2d 715, 720–721 (Pa. 1981)

(citations omitted).

In this case, the crimes were not just "of the same class." Appellant targeted prostitutes who were soliciting their services on Backpage and who lived in proximity to one another. The crimes took place in succession over the course of three consecutive days. The methods employed in carrying out the crimes were remarkably similar. After engaging in consensual sex for money, the victims were held up at gunpoint, forced to perform oral sex, raped vaginally from behind, and robbed. This shows a distinctive *modus operandi*. The crimes were committed on three different days, in three different locations, and involved different victims. Hence, there was no danger of confusion. Furthermore, the jury was clearly capable of separating the crimes,

as demonstrated by the jury's acquittal of sexual offenses pertaining to S.G. For all of the foregoing reasons, we conclude that the trial court did not err in consolidating all of the charges for a single trial. As such, the first issue fails.

Next, Appellant claims that the evidence was insufficient to sustain three of his robbery convictions because the Commonwealth failed to prove Appellant intended to commit theft or placed anyone in fear of immediate serious bodily injury. Appellant's Brief at 34-39. More specifically, Appellant challenges his three robbery convictions stemming from the first incident pertaining to J.J., T.S., and I.H., the three other people present at the residence where J.B. arranged to meet Appellant. Appellant contends that, "[t]he Commonwealth failed to prove beyond a reasonable doubt that [A]ppellant engaged in any theft from I.H.[,]" the three-year old who was present and, in fact, "there was testimony that [A]ppellant tried to give I.H. money to calm him down." *Id.* at 34-35. Appellant also argues that the Commonwealth failed to prove he engaged in a theft of J.J., maintaining that "[w]hile there is no question that [A]ppellant was in possession of [J.J.'s] phone for a short period of time of 10 to 15 minutes, he returned the [tele]phone before he left the house" and, "[t]hus, the evidence does not establish that [A]ppellant intended to permanently keep the [tele]phone." *Id.* at 36. Finally, with regard to T.S., Appellant argues that while he asked her for her telephone, Appellant did not "use [] threatening words [] at the time she gave [A]ppellant her [tele]phone, nor [] any menacing gestures, nor any

threats of injury, nor [] the brandishing of any weapon as she could not recall if [A]ppellant pulled out a gun while asking for the [tele]phone." *Id.* at 38.

We note that although the trial court did not rule on Appellant's claim before leaving the bench, "it is established that a defendant can challenge the sufficiency of the evidence for the first time on appeal." ***Commonwealth v. Gezovich***, 7 A.3d 300, 302 n.2 (Pa. Super. 2010), *citing* Pa.R.Crim.P. 606(A)(7) ("A defendant may challenge the sufficiency of the evidence to sustain a conviction of one or more of the offenses charged in one or more of the following ways [including] a challenge to the sufficiency of the evidence made on appeal."). "The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder." ***Gezovich***, 7 A.3d at 301.

Appellant challenges three of his convictions for robbery, statutorily defined, in pertinent part, as follows:

> (1)    A person is guilty of robbery if, in the course of committing a theft, he:
>
> (i) inflicts serious bodily injury upon another;
>
> (ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury;
>
> *         *         *

(iv) inflicts bodily injury upon another or threatens another with or intentionally puts him in fear of immediate bodily injury;

(v) physically takes or removes property from the person of another by force however slight[.]

18 Pa.C.S.A. § 3701.

We examined the robbery statute in **Commonwealth v. Gillard**, 850 A.2d 1273, 1276 (Pa. Super. 2004), wherein Gillard was convicted of five counts of robbery when he, without a word, robbed a bar at gunpoint. Despite only taking money from the cash register, Gillard was convicted of five counts of robbery because there were four customers and a bartender present at the time of the crime. Gillard waved his firearm at the customers and motioned for them to move to the back of the bar and turn around to face the wall. He then demanded the bartender open the cash register and give him the money. "[T]his Court examined the legislative intent of our robbery statute and determined that the legislature intended to permit separate punishments for threatening more than one person during the course of one robbery." **Gillard**, 850 A.2d at 1276, *citing* **Commonwealth v. Rozplochi**, 561 A.2d 25 (Pa. Super. 1989). We agreed with the Commonwealth's arguments and determined that convictions for multiple robberies are proper where a defendant "terrorized multiple people, though committed only a single theft." **Id.** We ultimately concluded:

Although [Gillard] did not make explicit verbal threats to the patrons in the bar, [] we find that Appellant's physical act of waving the victims to the back of the room with his gun and requiring that they remain facing the back wall was sufficiently

- 13 -

threatening to satisfy the essential element of the robbery statute. [Gillard's] non-verbal message was clear: any patron who resisted or refused his silent order made at gunpoint clearly was placing himself in imminent danger of being shot by [Gillard]. We previously have held that evidence that a gun was pointed at victims during a robbery was sufficient to establish that the perpetrators could inflict death or serious bodily injury.

*Id.* (internal citation omitted).

In this case, Appellant threatened the three people present at J.B.'s residence, I.H., J.J., and T.S., at gunpoint, stated that he would kill everyone if anyone entered the home, and locked them in a bathroom while he stole various items from the residence. As our prior case law makes clear, there is no requirement that items be taken from each individual who is present at the time of a robbery. Further, as set forth above, Appellant took multiple other items from the residence, including electronics and a wallet, after he threatened I.H., J.J., and T.S. at gunpoint and told them to stay in the bathroom. Thus, Appellant's arguments pertaining to I.H. and J.J. necessarily fail. Moreover, we reject Appellant's argument regarding T.S., because while Appellant claims there was no evidence that he threatened her at gunpoint when he demanded her telephone, there is ample evidence that Appellant threatened her with a firearm when he locked her in the bathroom. T.S. specifically testified that she saw Appellant with a firearm. N.T., 6/7/2017, at 139. In sum, Appellant's message was clear that any person who resisted or refused his orders made at gunpoint clearly placed himself or herself in imminent danger of being shot. Accordingly, we find sufficient evidence to support Appellant's robbery convictions pertaining to J.J., T.S., and I.H.

In the third issue we examine, Appellant contends that his verdicts are against the weight of the evidence presented. Appellant's Brief at 39-50. Appellant first claims that his verdicts for robbery pertaining to I.H., J.J., and T.S. were against the weight of the evidence for the same reasons he advanced regarding the sufficiency of the evidence. *Id.* at 40-42. Appellant also challenges the veracity of J.B., S.G., and Y.N., the alleged prostitutes, arguing that their testimony was inherently unreliable and not credible, because their initial statements to police were inconsistent with their testimony at trial. *Id.* at 42-49. Most notably, Appellant argues that the women did not tell the police about their connection with Backpage and the complainants in the first two cases did not tell police they initially engaged in consensual sex before the commission of the other crimes at issue. *Id.* Finally, Appellant argues that there was no physical evidence on the recovered firearm or from the witnesses' residences to corroborate the claims against him. *Id.* at 49.

Again, we note that we are presented with a unique procedural situation because the trial court judge is no longer sitting and did not rule on Appellant's weight of the evidence claim prior to leaving the bench. Our Supreme Court has addressed this issue as follows:

> The general rule in this Commonwealth is that a weight of the evidence claim is primarily addressed to the discretion of the judge who actually presided at trial. There is, of course, some tension between the power of trial courts to overturn jury verdicts premised upon weight claims, and the bedrock principle that questions of credibility are exclusively for the fact-finder.

Accordingly, the authority of the trial judge to upset a verdict premised upon a weight claim is narrowly circumscribed. A trial judge cannot grant a new trial because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion. Instead, a new trial should be granted only in truly extraordinary circumstances, *i.e.*, when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

[Our Supreme] Court [has] also consistently recognized that, while an appellate court may review whether the trial court abused its discretion in deciding a weight claim, its role is not to consider the underlying question in the first instance. Appellate review is generally cabined in this regard because of the disparity in vantage points between trial and appellate courts:

> An appellate court by its nature stands on a different plane than that of a trial court. Whereas a trial court's decision to grant or deny a new trial is aided by an on-the-scene evaluation of the evidence, an appellate court's review rests solely upon the cold record.

Thus, as [our Supreme Court has explained,] while there may be some legitimacy for a trial court, who has also observed the witnesses as they testified, to consider the weight of the evidence, there is surely no justification for an appellate court, relying upon a cold record, to exercise such a function. Given the unique nature of the power reposed in the trial court concerning a weight claim, [the Supreme] Court has emphasized on a number of occasions that one of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that new process was or was not dictated by the interests of justice. Accordingly, where the reasons for the trial court's granting or denying a new trial appear in the record, [our Supreme] Court has held that only a palpable abuse of discretion will warrant upsetting that decision on appeal.

None of the decisions holding that an appellate court may not review a ruling on a weight claim by considering the evidence itself in the first instance, however, raised the question [of] whether an appellate court is barred from reviewing such a claim where the judge who presided over the trial never ruled on the claim and is

now permanently unavailable to do so. Upon careful consideration of this issue of first impression, [our Supreme Court] agree[d] that this circumstance warrants an exception to the general rule barring appellate review of weight claims in the first instance.

\*          \*          \*

[…W]here a properly preserved weight of the evidence claim is raised on appeal and the judge who presided at trial failed to rule on the claim and is now permanently unavailable to do so, the claim must be reviewed by the appellate tribunal in the first instance. [Our Supreme Court stated that it was] confident in the ability of our appellate courts to apply this exception appropriately, with an eye to the delicate balance that exists between the jury's exclusive role in assessing credibility, and [Pennsylvania's] longstanding recognition of the power in courts to allow justice another opportunity to prevail when a verdict nevertheless shocks the judicial conscience. In this regard, [] our appellate courts are well-familiar with weight claims. Although appellate review has been confined to an assessment of the trial judge's exercise of discretion, it obviously has been necessary to consider the proper role and contours of the weight of the evidence doctrine, in evaluating that exercise of discretion. This holding exists as an exception to [the] general rule.

***Armbruster v. Horowitz***, 813 A.2d 698, 702–705 (Pa. 2002) (internal citations, quotations, footnotes, and original brackets omitted).

Here, Appellant properly raised and preserved his weight of the evidence claim. The trial judge never ruled on the claim and now he is permanently unavailable. Hence, as an exception to the general rule, we will review Appellant's weight claim for the first time on appeal.

Based upon our review of the record, we conclude that Appellant's weight of the evidence claim is without merit. Having already determined that there was sufficient evidence to support Appellant's robbery convictions pertaining to J.J., T.S., and I.H., the three people present at J.B.'s residence,

we conclude that those convictions are not against the weight of the evidence for the same reasons. Moreover, as set forth above, a new trial based upon the weight of the evidence should be granted "only in truly extraordinary circumstances, *i.e.*, when the jury's verdict is so contrary to the evidence as to shock one's sense of justice." *Armbruster*, 813 A.2d at 702. A new trial is not warranted, however, based upon "a mere conflict in testimony." *Id.* Furthermore, "[o]ur law is crystal clear that the trier of fact, in passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part, or none of the evidence presented." *Commonwealth v. Hopkins*, 747 A.2d 910, 914 (Pa. Super. 2000). Appellant bases his challenge to the veracity of J.B., S.G., and Y.N. solely on conflicts in their testimony, which does not warrant a new trial.

Regardless, J.B. testified that she gave a statement to police on January 8, 2016 and did not tell them that she met Appellant through "Backpage" because she was afraid she would get in trouble for prostitution. N.T., 6/6/2017, at 45-46. She initially told police that Appellant came to her door with a gun, but at trial stated that she lied to police so she would not get into trouble. N.T., 6/7/2017, at 65. T.S. testified that she did not initially tell police that J.B. invited someone to the house, because she did not want to embarrass J.B. or tell police what she was doing. *Id.* at 165. Y.N. testified that she did not initially tell police that she was raped, because all of the officers she dealt with were males and she was uncomfortable talking to them. N.T., 6/8/2017, at 139-141. The jury was free to credit this testimony and

we will not usurp their determination. For all of the foregoing reasons, Appellant's weight of the evidence fails.

Finally, we examine Appellant's claim that the trial court abused its discretion by imposing a manifestly excessive and unreasonable sentence. Appellant's Brief at 56-62. Appellant argues that his sentence "contravenes the sentencing scheme as a whole as the upper end of the sentence imposed a term unlikely to end during [A]ppellant's natural life span and the trial court gave virtually no explanation for the imposition of either the minimum or maximum terms on any of the six cases." *Id.* at 56. As such, Appellant contends that, "the trial court failed to consider [A]ppellant's rehabilitative needs as the Sentencing Code requires, focusing solely on retribution and punishment." *Id.* at 61.

Before we may entertain the merits of such a challenge, we must determine whether:

> (1) the appeal is timely; (2) appellant preserved his issue; (3) appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) there is a substantial question raised under the Sentencing Code.

*Commonwealth v. Rominger*, 199 A.3d 964, 970 (Pa. Super. 2018) (citation omitted).

Appellant has complied with all of these requirements. He filed a timely appeal, preserved his issues in a post-sentence motion, and included in his brief a concise statement of the reasons relied upon for allowance of appeal pursuant to Pa.R.A.P. 2119. Further, his claim raises a substantial question.

- 19 -

*See Rominger*, 199 A.3d at 970 *citing* **Commonwealth v. Serrano**, 150 A.3d 470, 473 (Pa. Super. 2016) (finding a substantial question where the appellant claimed the trial court failed to consider his individualized needs); **Commonwealth v. Coulverson**, 34 A.3d 135, 143 (Pa. Super. 2011) (finding a substantial question where the appellant argued the trial court focused on the seriousness of offense and did not consider his rehabilitative needs); **Commonwealth v. Caldwell**, 117 A.3d 763, 770 (Pa. Super. 2015) (*en banc*) (finding a substantial question where the appellant challenged consecutive sentences as excessive and the court's alleged failure to consider his rehabilitative needs).

We will therefore address Appellant's sentencing claim, pursuant to the following standard of review:

> The Sentencing Code provides that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant. The trial court has discretion within legal limits when sentencing a defendant, and absent an abuse of that discretion, we will not disturb its sentence. An abuse of discretion occurs where the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. The sentencing judge does not have to give a lengthy discourse explaining its reasons for imposing a sentence. However, the record as a whole must reflect the sentencing court's consideration of the facts of the crime and character of the offender.

**Rominger**, 199 A.3d at 970 (internal citations and quotations omitted).

Upon review of the sentencing transcript, we find that the trial court did not abuse its discretion in sentencing Appellant. Here, defense counsel told

the trial court about Appellant's troubled childhood, that he grew up in extreme poverty, watched his father die in front of him, and that his mother had an unexpected medical mishap which left her brain dead. N.T., 12/1/2017, at 7-8. Defense counsel acknowledged that Appellant had a juvenile record, but argued that Appellant did well under supervision. *Id.* at 8-9. While incarcerated in this matter, Appellant completed courses in job training and parenting classes. *Id.* at 9. The Commonwealth responded that Appellant's criminal history began as a juvenile. *Id.* at 15. In 2010, as an adult, Appellant was convicted of carrying a firearm without a license and then violated parole in 2014. *Id.* at 15. As such, the Commonwealth argued that Appellant's criminal behavior had escalated and he was a danger to society. *Id.* at 16. Moreover, the Commonwealth argued, that "[a] presentence report[6] indicate[d] [Appellant] racked up four prison violations for acting out

_____

[6] Appellant currently maintains that upon sentencing, "the trial court made no mention of considering a pre-sentence investigation report or mental health evaluation." Appellant's Brief at 59-60. This argument fails as the trial court docket reflects that the trial court ordered a pre-sentence investigation report and mental health evaluation. Trial Court Order, 6/15/2017. Moreover, defense counsel submitted and marked a pre-sentence investigation report into evidence at the beginning of the sentencing hearing and noted that he sent the report to the Commonwealth and the trial court *via* e-mail beforehand. N.T., 12/1/2017, at 4. The Commonwealth also refers to a presentence investigation report which it marked as "Commonwealth's Exhibit One for sentencing." *Id.* at 14. Accordingly, while the trial court did not specifically state that it had considered a presentence report when imposing Appellant's sentence, "[w]here pre-sentence reports exist, we shall ... presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors. A pre-sentence report constitutes the record

while incarcerated awaiting trial on this case." *Id.* at 16.  Appellant exercised his right to allocution and stated that the victims did not want to face him at sentencing because "the stuff is not true." *Id.* at 21.

In imposing Appellant's sentence, the trial court first acknowledged that Appellant's prior record score, prior convictions, and background was helpful in trying to determine how Appellant "gets in that situation, to have [such] a record." *Id.* at 22.  The trial court recognized that prior efforts at rehabilitation had not worked.  *Id.* at 22.  Appellant displayed no remorse, was not taking steps to improve, and was only concerned with himself.  *Id.* at 22-23.  The trial court further rejected Appellant's mitigation argument about his troubled childhood, stating:

> There are a lot of people in that unfortunate boat.  You can give up and say woe is me, or you can try to help yourself.  I just don't think you understand that.

*Id.* at 23-24.  Moreover, we note that the trial court recognized that the victims in this case were prostitutes and society has preconceived notions that "they can't be raped, they can't be robbed because of what they do for a living." *Id.* at 22-23.

Finally, the trial court had the benefit of a pre-sentence investigation report when imposing Appellant's sentence.  As such, we presume that the trial court was aware of relevant information regarding Appellant's character and weighed those considerations at sentencing.  Furthermore, the trial court

---

and speaks for itself." *Commonwealth v. Antidormi*, 84 A.3d 736, 761 (Pa. Super. 2014).

clearly stated its reasons for Appellant's sentence on the record. It determined that prior rehabilitation was fruitless as Appellant's criminal behavior had escalated and that, in this case, Appellant targeted particularly vulnerable victims. We discern no abuse of discretion in sentencing Appellant. Hence, Appellant's sentencing claim is without merit.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/5/19